JAY CLAYTON                                               :
United States Attorney for the
Southern District of New York                             :
By:     BENJAMIN A. GIANFORTI
Assistant United States Attorney                          :
26 Federal Plaza
New York, New York 10278                                 :
Tel. (212) 637-2490
                                                         :

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

UNITED STATES OF AMERICA                                  :

                                                         :    **VERIFIED COMPLAINT
                                                              FOR FORFEITURE**
                      v.                                  :

8.18866208 BITCOIN AND 8.18865895 BITCOIN                 :
CASH SEIZED FROM BITGO ACCOUNT NO.
63b4a0406789f7000775094435174f46;                         :    25 Civ. 3501

                                                         :
                Defendant-*in-rem*.
                                                         :

                                                         :

                                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff United States of America, by its attorney, Jay Clayton, United States

Attorney for the Southern District of New York, for its verified complaint alleges, upon

information and belief, as follows:

                        I.      **JURISDICTION AND VENUE**

        1.      This is a civil action in rem commenced by the United States of America

pursuant to Title 18, United States Code, Sections 981 and 982 and Title 21, United States Code,

Sections 881 and 853 seeking the forfeiture of approximately 8.18866208 Bitcoin ("BTC") and

                                            1

8.18865895 Bitcoin Cash ("BCH") seized from BitGo Trust Company ("BitGo") Account No. 63b4a0406789f7000775094435174f46 (the "Defendant-*in-rem*").

2.      This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.      Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

4.      The Defendant-*in-rem* is presently in the custody of the United States Department of Homeland Security, Homeland Security Investigations ("HSI").

## II.      **BACKGROUND**

### A.  Silk Road

5.      Silk Road was an online "darknet" black market in operation from approximately 2011 to 2013. Silk Road was used by drug dealers and other unlawful vendors to distribute massive quantities of illegal drugs and other illicit goods and services. Silk Road was also an effective mechanism for laundering the proceeds of narcotics distribution and the sale of other illicit goods and services.

6.      The illegal nature of the items sold on Silk Road was readily apparent to any user browsing through its offerings. The vast majority of the goods for sale consisted of illegal drugs of nearly every variety, which were openly advertised on the site as such and were immediately and prominently visible on the site's home page. The offerings for sale on the site at any single time amounted to multi-kilogram quantities of heroin, cocaine, and methamphetamine, as well as distribution quantities of other controlled substances, such as LSD.

7.      In addition to illegal narcotics, other illicit goods and services were openly sold

on Silk Road as well. These included, for example, illegal computer hacking services, malicious software (such as password-stealing programs), forged identity documents, stolen financial and/or identity information, and murder-for-hire or "hitman" services.

8.      Silk Road retained certain information about its users. For example, each user's Silk Road profile listed "Items for sale," which detailed the items that the user offered for sale on Silk Road (e.g., various narcotics) and included the total amount of offers made by Silk Road buyers for each listing. Each user's profile also listed "Items sold" that kept track of details regarding the user's sales on the platform.

9.      Silk Road's "forum" also contained extensive guidance on how to evade law enforcement. It included, for instance, numerous postings by users offering advice to other users on how they should configure their computers so as to avoid leaving any trace on their computer systems of their activity on Silk Road.

10.      The only form of payment accepted on Silk Road was a form of digital currency (also called cryptocurrency) known as Bitcoin.

11.      Silk Road operated as an "escrow marketplace," where user funds were treated similarly to funds in a bank account. When users wished to add funds, the market provided a Bitcoin "deposit address," similar to a bank account number. The market, which controlled this deposit address, received any funds sent to it and provided a corresponding credit to the user's escrow account.

12.      Once funds had been credited to a user's account, that user could purchase products from vendors operating on the market. Upon completion of such a purchase, the market debited the order value from the user's account and credited the value to the vendor's account. Similar to intra-bank transactions, the ordering process required adjusting the balances recorded

for the user's account and vendor's account; no Bitcoin was actually transferred.

13.     Conversely, when users wished to withdraw funds, they provided a Bitcoin "withdrawal address" to the market. The market would send the requested funds from its "cryptocurrency wallet" to that address and debit a corresponding amount from the user's account. In this case, funds actually moved. Users could withdraw funds to their own addresses, to addresses at a cryptocurrency exchange, or to anywhere else.

14.     Silk Road charged a commission for every purchase conducted by its users. The commission rate varied, but was generally between 8 to 15 percent per transaction, depending on the size of the sale: the larger the sale, the lower the commission.

15.     Silk Road's business model was to facilitate anonymous illegal transactions beyond the reach of law enforcement, including by hosting the site on the Tor network, which hides the identities of its users and their IP addresses, and by requiring vendors and customers to do business in Bitcoin, a virtual currency designed to be as anonymous as cash.

16.     Further, during its operation, Silk Road made use of a so-called "tumbler" to process Bitcoin transactions in a manner designed to obfuscate the tracking of individual transactions through the Bitcoin blockchain. As described on a certain Silk Road "wiki" page, Silk Road's tumbler sent "payments through a complex, semi-random series of dummy transactions . . . making it nearly impossible to link your payment with any coins leaving the site." In other words, if a buyer made a payment on Silk Road, the tumbler helped to obscure any link between the buyer's Bitcoin address and the vendor's Bitcoin address where the Bitcoin ended up. By design, this made it challenging to use the Bitcoin blockchain to follow the money trail involved in a given transaction, even where the buyer and vendor Bitcoin addresses were both known. An important and common function served by such "tumblers" is to assist with the laundering of criminal

proceeds.

17.     Beginning in or about November 2011, certain United States law enforcement agents made multiple undercover purchases of controlled substances from Silk Road vendors. Some of those purchases were made from the Southern District of New York, with the law enforcement agents receiving the controlled substances they purchased from Silk Road vendors in the Southern District of New York, as well.

18.     In connection with its investigation of Silk Road, the Government seized certain data servers used by Silk Road.

B.  Mt. Gox

19.     Mt. Gox was a Bitcoin exchange based in Tokyo, Japan, that was launched in or about 2010.

20.     Mt. Gox enabled its customers, for a fee, to exchange conventional currency, including United States dollars, for Bitcoin and to sell Bitcoin for currency. Customers could deposit, store, and withdraw their Bitcoin and conventional currency over the Internet through the Mt. Gox website.

21.     In or about February 2014, Mt. Gox shut down and entered liquidation proceedings in Japan. The sudden shutdown caused Mt. Gox's estimated 750,000 customers to lose access to their accounts, preventing them from withdrawing their Bitcoin from the exchange.

22.     In or about 2018, the Japanese court overseeing the Mt. Gox liquidation appointed a Japanese attorney to be Mt. Gox's Rehabilitation Trustee.[1] In or about 2021, a plan was approved where Rehabilitation creditors would collectively be paid billions of dollars in

---

[1] A "Rehabilitation Trustee" is similar to a Chapter 11 or Chapter 7 Trustee in a federal bankruptcy proceeding, insofar as they help administer the estate and make payments to creditors.

Bitcoin as compensation for approved claims. Rehabilitation creditors were contacted by the Rehabilitation Trustee to verify their account information and were ultimately informed that they may be eligible to receive a percentage of the funds they had previously held on the Mt. Gox platform at the time of liquidation.

23.     The Mt. Gox Rehabilitation Trustee selected BitGo, among other cryptocurrency exchanges, to receive proceeds from the distributions to be made by the Trustee.

24.     In or about July 2024, the Mt. Gox Rehabilitation Trustee made a large transfer of Bitcoin and Bitcoin Cash, covering multiple Mt. Gox creditors' claims, to BitGo.

III.     **PROBABLE CAUSE FOR FORFEITURE OF THE DEFENDANT-IN-REM**

25.     Among Silk Road's users was a user named "CalifornianDream," who sold controlled substances on the platform, including marijuana, in exchange for Bitcoin. For example, among CalifornianDream's "items for sale" in the data recovered from Silk Road's servers were "weed" and "cannabis," which CalifornianDream appears to have sold in multi-pound quantities to customers in the United States.

26.     Among Silk Road's users was another user named "Honeycomb Labs," who sold controlled substances on the platform, including marijuana, in exchange for Bitcoin. For example, among Honeycomb Labs' "items for sale" in the data recovered from Silk Road's servers was "cannabis," which Honeycomb Labs appears to have sold in multiple-pound quantities to customers in the United States.

27.     On or about August 3, 2012, a man named Christian Verdun opened an account at Mt. Gox. As part of Mt. Gox's account opening process, Verdun provided Mt. Gox with his name, date of birth, residential address, and email address (the "Verdun Mt. Gox Account").

28.     Between on or about August 11, 2012 and September 23, 2012, over the course

of approximately 27 transactions, approximately 276 Bitcoin were transferred from CalifornianDream's Silk Road account to the Verdun Mt. Gox Account.

29. On or about September 25, 2013, approximately 18.32 BTC were transferred from Honeycomb Labs' Silk Road account to a Bitcoin wallet address ending in Nkbj (the "Nkbj Wallet"), where the approximately 18.32 BTC were commingled with other Bitcoin. On or about October 2, 2013, approximately 68 BTC were transferred from the NKbj wallet to the Verdun Mt. Gox Account.

30. On or about October 14, 2013, approximately 63.4 BTC were transferred from the Verdun Mt. Gox Account to a Bitcoin wallet address ending in iQXC (the "iQXC Wallet"). The next day, approximately 54.46 BTC were transferred from the iQXC Wallet to a Bitcoin wallet address ending in oxsE (the "oxsE Wallet"). On or about October 25, 2013, approximately 46.25 BTC were transferred from the oxsE Wallet to a Bitcoin wallet address ending in PjXt (the "PjXt Wallet"). The next day, approximately 44.86 BTC were transferred from the PjXt Wallet to a Bitcoin wallet address ending in GCgo (the "GCgo Wallet"). The same day, approximately 43.47 BTC were transferred from the GCgo Wallet to a Bitcoin wallet address ending in PnXC (the "PnXC Wallet"). On or about November 7, 2013, approximately 3.47 BTC were transferred from PnXC Wallet to the Verdun Mt. Gox Account and approximately 40 BTC were transferred from the PnXC Wallet to a Bitcoin wallet address ending in wG8A (the "wG8A Wallet"). On or about November 13, 2013, approximately 10 BTC were transferred from the wG8A Wallet to the Verdun Mt. Gox Account and approximately 30 BTC were transferred from the wG8A Wallet to a Bitcoin wallet address ending in 9341 (the "9341 Wallet"). The next day, approximately 30 BTC were transferred from the 9341 Wallet to the Verdun Mt. Gox Account.

31. In sum, the approximately 18.32 BTC in narcotics proceeds transferred from

Honeycomb Labs' Silk Road on or about September 25, 2013, which were transferred to the Verdun Mt. Gox Account on or about October 2, 2013, ultimately ended up back in the Verdun Mt. Gox Account by on or about November 14, 2013, after multiple transfers across the various intermediary wallets discussed above. At the time that Mt. Gox shut down and entered liquidation proceedings in Japan in or about February 2014, the Verdun Mt. Gox Account held approximately 54 BTC.

32.    At no point in the months between on or about November 14, 2013—the point at which the Honeycomb Labs' funds had returned to the Verdun Mt. Gox Account—and February 2014—when Mt. Gox shut down—did the value of the funds on hand in the Verdun Mt. Gox Account, whether held in Bitcoin or conventional currency, dip below the then-current value of approximately 8.18866208 BTC. In other words, at least 8.18866208 BTC of the approximately 18.3 BTC derived from Honeycomb Labs' narcotics sales remained in the Verdun Mt. Gox Account at the time that Mt. Gox went out of business and froze its customers' accounts.

33.    In or about 2017, the developers of Bitcoin released Bitcoin Cash as a so-called "fork" of Bitcoin. The upshot of this fork was that holders of Bitcoin at the time of the fork were automatically granted an approximately identical amount of Bitcoin Cash. Accordingly, any Bitcoin Cash generated from the approximately 18.3 BTC derived from Honeycomb Labs' narcotics sales that remained in the Verdun Mt. Gox Account at the time that Mt. Gox went out of business and froze its customers' accounts is traceable to and also constitutes proceeds from the sale of narcotics and property involved in money laundering.

34.    In or about November 2022, Verdun opened the Verdun BitGo Account, having provided BitGo with identifying information, such as his name and date of birth, that matched the information Verdun previously provided to Mt. Gox in connection with opening the Verdun Mt.

Gox Account. At some point after opening the Verdun BitGo Account, Verdun designated it to receive funds from the Mt. Gox Rehabilitation Trustee. In or about September 2024, the Verdun BitGo Account received the Defendant-*in-rem* from the Mt. Gox Rehabilitation Trustee.  On or about December 5, 2024, the Government seized the Defendant-*in-rem* from the Verdun BitGo Account pursuant to a lawfully obtained seizure warrant.

35.    Based on the foregoing, there is probable cause to believe that the Defendant-*in-rem* constitutes proceeds of narcotics trafficking and property involved in money laundering and monetary transactions involved with criminally derived property (namely, narcotics trafficking).

## IV.    <u>FIRST CLAIM FOR FORFEITURE</u>

36.    Incorporated herein are the allegations contained in paragraphs one through thirty-five of this Complaint.

37.    Title 21, United States Code, Section 881(a)(6) subjects to forfeiture all "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [Subchapter I of Title 21], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of [Subchapter I of Title 21]."

38.    The Defendant-*in-rem* is subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6) because there is probable cause to believe that the Defendant-*in-rem* constitutes moneys furnished or intended to be furnished any person in exchange for a controlled substance and proceeds traceable to such an exchange, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## V.    <u>SECOND CLAIM FOR FORFEITURE</u>

39.    Incorporated herein are the allegations contained in paragraphs one through thirty-five of this Complaint.

40.    Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

41.    Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal penalties on any person who:

> knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .
>
> knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

42.    Under Title 18, United States Code, 1956(c)(7)(A), "specified unlawful activity," includes, among other things, "an offense racketeering activity as defined in 18 U.S.C. § 1961(1)." Section 1961(1) provides in turn that racketeering activity includes, among other things, "any act ... dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."

43.    By reason of the foregoing, the Defendant-*in-rem* is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A), because the Defendant-*in-rem* constitutes property involved in monetary transactions in property derived from specified unlawful activity, to wit, narcotics trafficking.

10

## VI.    <u>**THIRD CLAIM FOR FORFEITURE**</u>

44.    Incorporated herein are the allegations contained in paragraphs one through thirty-five of this Complaint.

45.    Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title, or any property traceable to such property."

46.    Title 18, United States Code, Section 1957(a) imposes criminal penalties on any person who:

> in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

47.    Title 18, United States Code, Section 1957(d) provides that "The circumstances referred to in subsection (a) are…that the offense under this section takes place in the United States."

48.    Title 18, United States Code, Section 1957(f)(3) provides that "the term[] 'specified unlawful activity'…shall have the meaning given [that] term in section 1956 of this title."

49.    Under Title 18, United States Code, Section 1956(c)(7)(A), "specified unlawful activity," includes, among other things, "an offense racketeering activity as defined in 18 U.S.C. § 1961(1). Section 1961(1) provides in turn that racketeering activity includes, among other things, "any act ... dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."

50.    By reason of the foregoing, the Defendant-*in-rem* is subject to forfeiture to the

United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A), because the Defendant-*in-rem* constitutes property of a value greater than $10,000 derived from specified unlawful activity, to wit, narcotics trafficking.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.


Dated: New York, New York
        April 28, 2025

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America


By:    _____
       Benjamin A. Gianforti
       Assistant United States Attorney
       26 Federal Plaza
       New York, New York 10278
       Tel. (212) 637-2490

12

<u>VERIFICATION</u>

STATE OF NEW YORK                    )
COUNTY OF NEW YORK                   :
SOUTHERN DISTRICT OF NEW YORK        )

Matthew Macchiaroli, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

The sources of deponent's information and the grounds of his belief are conversations with other law enforcement officers and others, official records and files of HSI and the United States Government, and information obtained directly or indirectly by deponent during an investigation of alleged violations of Titles 18 and 21 of the United States Code.

/s/ _____

Matthew Macchiaroli
Special Agent
Homeland Security Investigations

13